### CORRIGAN v. MACLOON et al.

Circuit Court of Appeals, Ninth Circuit.
November 14, 1927.

No. 5224.

Libel and slander ⊜⇒50½—Foreign and irrelevant matter in communication otherwise privileged held libelous per se (Civ. Code Cal. § 45).

Foreign and irrelevant matter in a written communication otherwise privileged *held* libelous per se, within Civ. Code Cal. § 45, and to support an action for damages.

In Error to the District Court of the United States for the Southern Division of the Southern District of California; Edward J. Henning, Judge.

Action at law by Emmett Corrigan against Louis O. Macloon and Lillian A. Macloon. From a judgment dismissing complaint on demurrer, plaintiff brings error. Reversed and remanded, with directions.

By writ of error Corrigan asks reversal of a judgment of the District Court sustaining a general demurrer to his complaint against L. O. and L. A. Macloon, and dismissing action. The question is: Does the complaint state a cause of action?

Corrigan alleged: That he is an actor of well-known reputation, and in August, 1925, contracted in writing with defendants to act the character of "Captain Flagg" in a play known as "What Price Glory," at a salary of $675 per week. That thereafter he appeared as required by the terms of the contract until February 12, 1926. That defendants, inspired by malice and hatred toward plaintiff, and for the purpose of injuring him and holding him up to ridicule before his profession and the public, composed and published the following telegram:

"Denver, Colorado, January 30, 1926.

"Manager New Crawford Theatre, Topeka, Kansas: On account of sickness in company am forced to cancel What Price Glory date February 12. Please forward bills incurred to Louis O. Macloon, Play House, Los Angeles, California.

"Louis O. Macloon."

That defendants owned and managed the Los Angeles Play House and are engaged in promoting and organizing theatrical companies and in such activities, producing before the public a play entitled "What Price Glory." That by the telegram they intended to publish and advertise that cancellation of the contract of defendants with the named theater in Topeka was caused by the illness of plaintiff and that it was so understood, defendants well knowing that plaintiff was not ill and that the publication of the telegram would injure him. That defendants were actuated in sending the telegram by malice and hatred toward plaintiff and a desire to injure him, and did injure him, to his financial damage. In a second cause of action plaintiff, after substantially repeating the more general allegations as to his business, and that of defendants and as to the contract made with them, all as set out in the first cause of action, alleged that about February 15, 1926, defendants, intending to expose plaintiff to contempt and ridicule, and to cause him to be shunned and avoided in his profession as an actor, and actuated by spite and jealousy toward plaintiff, and for the purpose of destroying his good name and reputation, and well knowing that plaintiff had always borne a good reputation and was widely known, particularly by the Actors' Equity Association, falsely and maliciously and for the purpose of injuring plaintiff, printed, published, and circulated a letter of false, untrue, and defamatory words as follows:

"The Play House, Los Angeles.

"Office of Lillian Albertson, Actors' Equity Association, Hollywood.—Dear Mr. Nowell: Mrs. Wines has telephoned that you would like a written answer to your telephone query and complaint on behalf of Mr. Corrigan of the What Price Glory company now playing Denver.

"When Mr. Woods gave me your message, I at once wired Mr. Ellsler, our company manager, to report to me by wire if the company were forced to travel on trains on which there were no day coaches, and had in consequence been obliged to pay for Pullman space. Here is his reply:

"'All actors were asked and took space from own choice except Corrigan who was not asked, as I assumed he would want same. Complaint sent through deputy no names mentioned, but have reason to feel sure it was Corrigan.'

"From this wire I assume the actors traveled in Pullman, because they wished to, and our manager naturally felt that Corrigan, being the star, would feel slighted if no reservation were made for him, and that he would scarcely wish to ride in a day coach while all the other members rode in the Pullman.

"As Mr. Corrigan is a notorious trouble maker, I had given Mr. Ellsler instructions to do nothing whatever for him beyond the strictest requirements of his contract, and if Mr. Ellsler had followed instructions, and volunteered nothing at all for Mr. Corrigan's comfort, there would have been no opportunity for complaint; but it is difficult to make a man as soft and courteous as Ellsler believe an actor could be so contemptible as to complain of so small a matter. On the other hand, I can imagine Corrigan's rage, had he gone to the station and found no reservation made for him, but that would have been nothing to take up with Equity.

"Mr. Macloon has found a way to rid us of any further annoyance from this man, who has been furious and unruly to a degree ever since we appealed to Equity to force him to darken his white hair for the part of Captain Flagg, as he had agreed to do before signing the contract, and which he refused to do up to the time of Equity's order, unless we would pay him a thousand a week. The company will close, and we will give Mr. Corrigan an opportunity to find another 'Terrible' management.

"Yours, Lillian A. Macloon."

Plaintiff alleged that the Actors' Equity Association is composed of actors and employers of actors, and within its membership is a council of 50 leading actors and employers of actors in the United States; that the business of the association is to promote contracts and settle differences between producers and employees; that defendants, intending to injure plaintiff and humiliate him, and expose him to the ridicule and contempt of the council of 50, uttered and published the letter sent to Nowell, then a member of the association and in charge thereof at Hollywood, California; that the intent of the defendants was to have it understood that plaintiff was guilty of some wrong and was a trouble maker, contemptible and constantly complaining; that they meant to injure his character and to prevent his obtaining employment with other theatrical companies and to injure his good name; and that they wrote, uttered, and published the letter with malice for the purpose of injuring plaintiff in his profession, and that he was damaged to the extent of $100,000.

John A. Deweese, Walter S. Coen, and Josiah Coombs, all of Los Angeles, Cal., for plaintiff in error.

Bradner W. Lee, Jr., and Kenyon F. Lee, both of Los Angeles, Cal., for defendants in error.

Before GILBERT, HUNT, and RUDKIN, Circuit Judges.

HUNT, Circuit Judge (after stating the facts as above). We cannot see that the telegram set out in the first cause of action is libelous, or of a libelous character. The sender of the message was one of the managers of a corporation which had control and management of the play referred to. In the exercise of his authority he telegraphed cancellation of the performance of the play set for a named date. He gave illness—whether of himself or of plaintiff is not important—as the reason for taking that action. The message made no disparaging mention of plaintiff, directly or by implication; nor was any language used which in any way exposed plaintiff to contempt, ridicule, or obloquy, or tended to injure him in his profession as an actor. If, by the cancellation of the contract for performance at Topeka, plaintiff was financially damaged, a right of action may exist, but not in libel. Cal. C. C. § 45.

The letter pleaded in the second cause of action is separable into two parts. After the introductory paragraph, which merely states that the Equity Association desired a written answer to its telephone inquiry on behalf of the plaintiff, then playing in Denver, defendant Lillian Macloon states that she telegraphed for information. The next paragraph is the answer to that telegram by defendants' company manager. The fourth paragraph is a statement by the writer of the letter that she assumes that the actors had traveled in cars of their own choice, and that the company manager felt that plaintiff, being the star, would have been slighted if no Pullman reservation had been made for him.

As the defendant writer of the letter and the Equity Association which received it, had a common interest in any difference that may have arisen between the actor and his employer, and as there is nothing in the paragraphs referred to evidencing malice on the part of the writer, that part of the communication was privileged, and if the letter had ended there, plaintiff would have been

properly put. out of court. Ashcroft v. Hammond, 197 N. Y. 488, 90 N. E. 1117.

But in the second part of the letter the writer voluntarily went beyond the question asked and introduced matters not germane to the occasion and which tended to injure plaintiff in his profession as an actor. For an employer of an actor to write and publish of him that he is a notorious trouble maker, contemptible, and that a way has been found to rid the employers of further annoyance from the actor, that he has been furious and unruly to a degree, and that the employing company of which she is a member will close, and give the actor an opportunity to find another "terrible management," is, we think, to give persons unacquainted with the actor fairly to understand that he is unfavorably known as one who creates annoyances, is refractory, deserving of scorn, and is of a turbulent and angry temper. It follows that the irrelevant and foreign matter in the communication is not privileged. Gatley on Libel and Slander, p. 275; Adam v. Ward [1917] A. C. 249. In our opinion the language used is included in the California statutory definition of libel (section 45, C. C. C.), which is: "Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." From libel per se, damage is implied by law. Tonini v. Cevasco, 114 Cal. 266, 46 P. 103.

The judgment is reversed, and the cause is remanded, with directions to proceed in accordance with the views herein expressed.

Reversed and remanded.